FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

99 APR 28 PM 3: 49

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILLIAM J. WYNN, ex relator, State of Alabama,

       Plaintiff,

vs.

PHILIP MORRIS INC., et al.,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)

CV 98-BU-1597-S

ENTERED

APR 2 8 1999

## Memorandum Opinion

On March 16, 1999, this court entered a show cause order requesting the parties to this litigation to demonstrate why the instant action should not be remanded to the Circuit Court of Jefferson County, Alabama, from whence it came. On March 30, 1999, a brief was filed by the defendants, Philip Morris, Inc., R.J. Reynolds Tobacco Company, Brown and Williamson Tobacco Corporation and Lorrilard Tobacco Company, in response to the show cause order of this court with regard to the issue of jurisdiction. On April 9, 1999, defendant Liggett Group, Inc., filed a motion to join in the brief of the other defendants in support of jurisdiction over the instant action. In their brief, the defendants argued that jurisdiction was properly vested in this court as the court had jurisdiction over the action under the federal question statute, 28 U.S.C. § 1331,[1] and based upon diversity of citizenship as set

---

[1] Section 1331 of Title 28 of the United States Code states, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

forth at 28 U.S.C. § 1332.[2]  For the consequent reasons, this court will remand the instant

action to the Circuit Court of Jefferson County, Alabama.

Under 28 U.S.C. § 1447(c), the court has the authority to remand a case to state court

"[i]f at any time before final judgment it appears that the district court lacks subject matter

jurisdiction. . . ."  *See In re Bethesda Memorial Hosp., Inc.*, 123 F.3d 1407, 1410 (11th Cir.

1997).  As the Eleventh Circuit Court of Appeals further explained in *University of South

Alabama v. American Tobacco Co.*, 168 F.3d 405,  (11th Cir. 1999):

> This provision is mandatory and may not be disregarded based on speculation about
> the proceeding's futility in state court. *See International Primate Protection League v.
> Administrators of Tulane Educ. Fund*, 500 U.S. 72, 87-89 (1991); *Smith v. Wisconsin
> Dep't of Agric., Trade and Consumer Protection*, 23.F.3d 1134, 1139 (7th Cir. 1994); *see
> also Bruns v. National Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997)
> (section 1447(c) is mandatory); *Bromwell v. Michigan Mut. Ins. Co.*, 115 F.3d 208, 213
> (3d Cir. 1997) (same); *Maine Ass'n of Interdependent Neighborhoods v. Commissioner,
> Me. Dep't of Human Servs.*, 876 F.2d 1051, 1054 (1st Cir. 1989) (same). Moreover, a
> federal court must remand for lack of subject matter jurisdiction notwithstanding the
> presence of other motions pending before the court. *See, e.g., Marathon Oil*, 145 F.3d
> at 220 (holding that district court should have considered motion to remand for lack
> of subject matter jurisdiction before it addressed motion to dismiss for want of
> personal jurisdiction); *Toumajian v. Frailey*, 135 F.3d 648, 655 (9th Cir. 1998)
> (holding that district court should have remanded for lack of subject matter
> jurisdiction and should not have dismissed on grounds of ERISA preemption); *Avitts
> v. Amoco Prod. Co.*, 53 F.3d 690, 693 (5th Cir. 1995) (per curiam) (holding that district
> court had no jurisdiction to order interim costs and attorneys' fees where action
> should have been immediately remanded for lack of subject matter jurisdiction);
> *Smith*, 23 F.3d at 1139 (holding that district court had no authority to dismiss
> removed claim without subject matter jurisdiction); *In re Bear River Drainage Dist.*,
> 267 F.2d 849, 851 (10th Cir. 1959) (holding that motion to remand for lack of subject
> matter jurisdiction necessarily precedes motion to dismiss); *Nichols v. Southeast
> Health Plan of Ala., Inc.*, 859 F.Supp. 553, 559 (S.D.Ala. 1993) (same).
>     Because removal jurisdiction raises significant federalism concerns, federal
> courts are directed to construe removal statutes strictly. *See Shamrock Oil & Gas Corp.
> v. Sheets*, 313 U.S. 100, 108-09 [] (1941). Indeed, all doubts about jurisdiction should

---

[2]  The general requirements of diversity jurisdiction, as relates to the present action, are described in
subsection (a) of section 1332:

> The district courts shall have original jurisdiction of all civil actions where the matter in
> controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is
> between —
>
>         (1) citizens of different States. . . .

28 U.S.C. § 1332(a)(1).

be resolved in favor of remand to state court. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11ᵗʰ Cir. 1994) *(citing Boyer v. Snap-on Tools Corp.*, 913 F.2d 108 (3ᵈ Cir. 1990); *Coker v. Amoco Oil Co.*, 709 F.2d 1433 (11th Cir.1983)). A presumption in favor of remand is necessary because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it deprives a state court of its right under the Constitution to resolve controversies in its own courts. For example, in *Marathon Oil*, the district court dismissed an action on removal from state court for want of personal jurisdiction before reaching the issue of subject matter jurisdiction. 145 F.3d at 215. On rehearing en banc, the Fifth Circuit held that the district court erred in failing to first examine its subject matter jurisdiction and, because jurisdiction was in fact lacking, in failing to remand to state court. *See id.* at 220. The court reasoned that such an approach "accords the proper respect to the state courts, as the residual courts of general jurisdiction, to make the personal jurisdiction inquiry when [federal courts] lack either constitutional or statutory subject-matter jurisdiction over a removed case." *Id.*; *see also Bromwell*, 115 F.3d at 214 (noting that justiciability is a matter for the state court to decide where case should have been remanded to state court for lack of subject matter jurisdiction rather than dismissed); *Smith*, 23 F.3d at 1139 (declining to speculate on issue of state law where case should have been remanded to state court for lack of subject matter jurisdiction rather than dismissed).

The facts essential to resolving whether this action should be remanded to state court are relatively uncomplicated. On May 27, 1998, the plaintiff, William Wynn ("Wynn"), as a relator for the State of Alabama,[3] filed an application for writ of quo warranto in the Circuit Court of Jefferson County, Alabama, against the defendant tobacco companies, pursuant to the State of Alabama's *quo warranto* provision, §6-6-590, Alabama Code of 1975.[4] The relief originally sought by the plaintiff was the revocation of the defendants' corporate charters. The reason for granting this relief originally asserted by the plaintiff was that the defendants

---

[3] BLACK'S LAW DICTIONARY (6ᵗʰ ed. 1990) defines a suit brought *ex relatione* as a "legal proceeding[] which [is] instituted by the attorney general (or other proper person) in the name and behalf of the state, but on the information and that the instigation of an individual who has a private interest in the matter. . . ." The "relator" is the individual who brings the action on behalf of the state. Thus, the instant case is mis-styled, as the action is brought by the State of Alabama, *ex relatione*, that is, upon the information or relation of, Wynn. *Cf. State ex rel. Baker v. Evans*, 683 So.2d 421 (Ala. 1996); *Carr v. State ex rel. Goggans*, 720 So.2d 197 (Ala. 1996); and *Dunlap v. State ex rel. Durrett*, 622 So.2d 1305 (Ala. 1993).

[4] Section 6-6-590(a) of the Alabama Code of 1975 provides that "[a]n action may be commenced . . . , in the name of the state, against the offending corporation, on the information of any person for the purpose of vacating the charter or annulling the existence of any corporation. . . ," where the corporation performs one of a number of offending acts.

had violated a litany of Alabama statutes and had committed a host of Alabama common law torts in the course of their sale of tobacco products within the State of Alabama.

The defendants, desiring not to try the action in the state court, promptly filed a notice of removal with this court pursuant to 28 U.S.C. § 1446(a),[5] contending that this court had diversity jurisdiction over the instant action permitting the court to hear the case.[6] The plaintiff responded with a motion to remand filed on July 14, 1998, in which he contended that given the peculiar nature of the *quo warranto* action there could exist no diversity jurisdiction over the instant action and that the value of the matter in controversy did not exceed $75,000.00.[7] This court denied the motion to remand on November 23, 1998, citing as its reasons for denying remand, one, that a federal court can have diversity jurisdiction over a *quo warranto* action — i.e., that a *quo warranto* action had no special characteristics that prevented its removal to federal court,[8] and two, that the action was similar to an action

---

[5] Under this section,

> [a] defendant or defendants desiring to remove any civil action . . . from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

28 U.S.C. § 1446(a).

[6] The date of the notice of removal was June 22, 1998.

[7] A plaintiff can move to remand a removed case to state court "on the basis of any defect other than subject matter jurisdiction . . . within 30 days after the filing of the notice of removal. . . ." 28 U.S.C. § 1447(c). Under this scheme, non-jurisdictional defects in removal are waived if not made within thirty (30) days after the notice of removal is filed. *In re Bethesda Memorial Hosp., Inc.*, 123 F.3d 1407, 1409-10 (11th Cir. 1997). However, a motion to remand grounded on a lack of subject-matter jurisdiction can be made at any time. *In re Uniroyal Goodrich Tire Co.*, 104 F.3d 322, 324 (11th Cir. 1997). There is a third category of grounds for remand, those cases in which remand is premised on neither a "defect" in the removal process nor a jurisdictional flaw, as in the case of federal abstention doctrine, denial of supplemental jurisdiction or the existence of a forum selection clause. The Eleventh Circuit Court of Appeals has recently concluded that a remand premised on one of these non-jurisdictional, non-defect grounds does not fall within the thirty day limitations period and can be the subject of appellate review. *Snapper v. Redan,* — F.3d —, —, 1999 WL 184017 at *8 (11th Cir. April 5, 1999).

[8] In so holding, this court cited to and explained *Ames v. State of Kansas*, 111 U.S. 449 (1884), in which the Supreme Court permitted removal of a *quo warranto* action premised on federal question jurisdiction. Although this court did not discuss the issue, presumably the plaintiff sought to claim that a

in which punitive damages are sought and the relief, which would certainly benefit the State in an amount greater than $75,000.00, actually accrues to the State as aggregate relief, the full amount being attributable to State of Alabama, the "named" plaintiff in the suit, as well as the relator to the action, Wynn.[9]

Prior to entry of this court's order denying remand of the instant action, the defendants, on November 6, 1998, filed a motion for judgment on the pleadings. Among other contentions, the defendants argued that the plaintiff had not pursued his *quo warranto* claim under the appropriate statutory section and asserted that his failure to post a security bond to cover the defendants' costs in litigating the action divested any court, state or federal, of jurisdiction over the claims. This court entered a memorandum opinion and an order on February 1, 1999, denying the defendants' motion, but requesting that the plaintiff file an amended complaint clarifying his claim, ordering the plaintiff to plead his claim under the appropriate statutory section and requiring that the plaintiff post appropriate security within ten days of the entry of the order. Soon after the entry of that order and a later clarifying order, the plaintiff complied with these requests.

The plaintiff filed his amended complaint on February 16, 1999. In that complaint, the plaintiff restates his claim against the defendants, seeking as relief the revocation of the

---

state *quo warranto* action was akin to a divorce or alimony proceeding, which, even when the parties to such a proceeding are diverse, cannot be the proper subject of diversity of citizenship jurisdiction. *See Ankenbrandt v. Richards*, 504 U.S. 689, 700-01 (1992), reaffirming the jurisdictional limitation set forth in *Barber v. Barber*, 62 U.S. (21 How.) 582 (1859). However, as the Supreme Court noted in *Ankenbrandt*, the rationale for maintaining the domestic relations exception to statutory diversity jurisdiction is not that the Supreme Court in *Barber* got its construction of the then-existing jurisdictional statute right in exempting domestic relations cases, but that subsequent Congresses did nothing to change or address that decision in later alterations of the diversity statute. *See Ankenbrandt*, 504 U.S. at 700. In the instant case, there is no prior exception to the statutory diversity jurisdiction that has been made by the Supreme Court and which has become ingrained in the structure of the statutory jurisdiction of the federal district courts. As such, this court found nothing exceptional about a *quo warranto* action exempting that class of cases from this court's diversity jurisdiction.

[9] See this court's memorandum opinion entered on November 23, 1998, at 7-8, discussing *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1359 (11th Cir. 1996).

defendants' certificates of authority to do business within the State under § 6-6-591.[10] As grounds for the relief, the plaintiff asserts that the defendants have violated a host of federal and state statutes, and have engaged in a number of common law torts. Among the federal statutes with which the defendants have allegedly failed to comply are the Racketeer Influenced and Corrupt Organizations Act ("RICO") and "federal antitrust laws." On March 15, 1999, the defendants responded to the amended complaint by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

On March 16, 1999, this court, having become aware of the decision of the Eleventh Circuit Court of Appeals in *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405 (11th Cir. 1999), entered a show cause order requesting that the parties brief the court on its subject matter jurisdiction over the instant action.

## Contentions & Analysis

The defendants now assert that there is both federal question and diversity jurisdiction over the instant action. The defendants first argue that the amended complaint, which asserts as bases for *quo warranto* relief violations of RICO and federal antitrust statutes, evinces the presence of federal question jurisdiction over the instant action. The defendants also claim that there is diversity jurisdiction because the State of Alabama is not a real party in interest in the instant suit, but remains a purely nominal party and as such this suit is one between citizens of different states, not between a state and citizens of different states.

---

[10] For simplicity's sake, this court has engaged in a bit of revisionist history in the body of the opinion. In response to the defendants' motion to dismiss, the plaintiff moved to amend his earlier filed pleading on January 8, 1999, to restate his *quo warranto* claim under § 6-6-591. The court granted the plaintiff's motion on January 12, 1999. After entry of this court's February 2, 1999, order, the plaintiff filed another amended complaint, in which he again mispled the statutory source of his claim. Nonetheless, it is clear from the amended complaint that the plaintiff seeks his relief under § 6-6-591 of the Alabama Code of 1975. The court refers to this second amended complaint throughout the instant opinion as "*the* amended complaint."

FEDERAL QUESTION JURISDICTION.

Title 28, section 1331 of the United States Code states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This basis for the subject-matter jurisdiction of the district court is commonly known as "federal question jurisdiction." In modern federal courts practice, the federal question jurisdiction of the district courts is to be evaluated through examination of the well-pleaded complaint. *See Louisville & Nashville Railroad v. Mottley*, 211 U.S. 149, 152 (1908).[11] *See also Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) ("The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts.") Unlike a determination of diversity jurisdiction — in which factual inquiries are often appropriate for purposes of ascertaining the residency of a party or the likelihood of success of an action against an ostensibly non-diverse party — when jurisdiction is premised on the existence of a federal question, the district court must determine from the face of the complaint whether the plaintiff's action arises "under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, or, when a defendant is attempting removal of the case, whether the action could initially have

---

[11] This, arguably, was not always the case. General federal question jurisdiction, with the exception of a brief period between the close of Adams' Federalist Administration and the opening of Jeffersonian era, was not vested in the district courts until the Reconstruction period, in 1875. This early predecessor to the present federal question and federal question removal statutes was construed to give federal district courts nearly the fullest extent of the Article III jurisdiction over federal questions. *See* Michael G. Collins, *The Unfortunate History of Federal Question Removal*, 71 IOWA L. REV. 717, 720-30 (1986). This included the ability of a federal district court to evaluate a federal law defense to a state law action in determining the presence of a federal question in an action initiated in or removed to federal court. *Id.*, see especially n.68, listing decisions in which removal was permitted on the basis of a federal defense. The tide began to turn against the free-wheeling days of removal with the Supreme Court's decision in *Metcalf v. City of Watertown*, 128 U.S. 586,588-89 (1888), stating that although it had been "often decided by this court that a suit may be said to arise under the constitution or laws of the United States, within the meaning of that act, even where the federal question upon which it depends is raised, for the first time in the suit, by the answer or plea of the defendant," the grounds of removal was either to be disclosed in the plaintiff's complaint or in the petition for removal. *In State of Tennessee v. Union & Planters Bank*, 152 U.S. 454, 461 (1894), the Supreme Court took the conclusion of the *Metcalf* court a step further and explained that, with respect to the post-reconstruction era Judiciary Acts of 1887 and 1888, federal question jurisdiction will rest with a federal court only on the basis of a federal claim stated on the face of the plaintiff's pleading. So it remains.

been brought in federal court. *See City of Chicago v. Int'l College of Surgeons*, — U.S. —, —, 118 S.Ct. 523, 529 (1997).

> Generally, under section 1331, a suit arises under federal law if there appears on the face of the complaint some substantial, disputed question of federal law. *See Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 12 [] (1983). Accordingly, to support removal, the defendant must locate the basis of federal jurisdiction in those allegations necessary to support the plaintiff's claim, ignoring his own pleadings and petition for removal. A defendant may not remove on the basis of an anticipated or even inevitable federal defense, but instead must show that a federal right is "an element, and an essential one, of the plaintiff's cause of action." *Gully v. First Nat'l Bank*, 299 U.S. 109, 111 [] (1936).

*Carpenter v. Wichita Falls Independent School Dist.*, 44 F.3d 362, 366 (5th Cir. 1995). "The [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

In most cases, claims pled under state law are to be taken at face value for purposes of evaluating jurisdiction. However, in two types of situations the court may disregard the state law facade of a complaint, thereby bringing to the surface the federal claims lying beneath. *See Her Majesty the Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 339 (6th Cir. 1989) (stating that "an exception to the well pleaded complaint rule exists when plaintiffs 'artificially plead' their complaint in order to avoid federal jurisdiction of claims that are federal in nature").[12] The first instance in which federal question jurisdiction can be exposed in a claim couched in state law is "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 (1983). The second circumstance in which federal

---

[12] Occasionally, a defendant will attempt removal to federal court on the basis that the plaintiff "artificially pled" his state law claims and that, in fact, the factual bases for the plaintiff's claim more readily suggest a federal, rather than state, action, or that the facts alleged support a federal cause of action, but no state cause of action. Either of these events may occur without implicating the jurisdiction of a federal district court, however. A plaintiff is permitted to deceptively plead or mis-plead his or her own claims to remain in state court, as long as no federal question is necessarily implied from the claims in either of the two ways stated in the body of this opinion.

question jurisdiction can be brought to the surface of a complaint drafted in the language of state law is that in which the federal claims completely preempt the state law claims.

The defendants claim that although federal question jurisdiction is not obvious from the face of the complaint, it exists beneath the state-law veneer of the plaintiff's claim, because resolution of the plaintiff's state law claim requires an analysis of federal law — RICO and the federal antitrust statutes. Cases on the issue of whether a federal issue is embedded in a state law claim will give rise to federal question jurisdiction are seemingly difficult and conflicting. In *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257 (1916), the plaintiff brought suit in state court against the defendant for libel because of statements made by the defendant that the plaintiff was infringing upon a patent of the defendant. The defendant removed the case to the district court, which later granted a motion to dismiss because the federal court had exclusive jurisdiction over any patent claim, the resolution of which the district court found would be an aspect of plaintiff's action for libel. The Supreme Court, with Justice Holmes writing for the majority, reversed, holding that the relation of the patent infringement claim to the defamation action was insufficient to create federal question jurisdiction:

> A suit for damages to business caused by a threat to sue under the patent law is not itself a suit under the patent law. And the same is true when the damage is caused by a statement of fact,— that the defendant has a patent which is infringed. What makes the defendants' act a wrong is its manifest tendency to injure the plaintiff's business; and the wrong is the same whatever the means by which it is accomplished. But whether it is a wrong or not depends upon the law of the state where the act is done, not upon the patent law, and therefore the suit arises under the law of the state. *A suit arises under the law that creates the cause of action.* The fact that the justification may involve the validity and infringement of a patent is no more material to the question under what law the suit is brought than it would be in an action of contract. If the state adopted for civil proceedings the saying of the old criminal law: the greater the truth, the greater the libel, the validity of the patent would not come in question at all. In Massachusetts the truth would not be a defense if the statement was made from disinterested malevolence. Rev. Laws, chap. 173, § 91. *The state is master of the whole matter, and if it saw fit to do away with actions of this type altogether, no one, we imagine, would suppose that they still could be maintained under the patent laws of the United States.*

*Id.* at 259-60 (emphasis added).

In *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), Smith, a shareholder
in the defendant corporation, sued for an injunction to keep the defendant corporation from
purchasing federal government bonds that he claimed were issued in violation of the
Constitution. The cause of action was ostensibly grounded in state law. Although no
objection had been made to the court's jurisdiction at either the district or circuit court level,
the Court felt it necessary to address the question of under what law the plaintiff's claim
arose.

> The general rule is that, where it appears from the bill or statement of the
> plaintiff that the right to relief depends upon the construction or application of the
> Constitution or laws of the United States, and that such federal claim is not merely
> colorable, and rests upon a reasonable foundation, the District Court has jurisdiction
> under this provision.
> At an early date, considering the grant of constitutional power to confer
> jurisdiction upon the federal courts, Chief Justice Marshall said:
>> "A case in law or equity consists of the right of the one party, as well as of the
>> other, and may truly be said to arise under the Constitution or a law of the
>> United States, whenever its correct decision depends upon the construction of
>> either," *Cohens v. Virginia*, 6 Wheat. 264, 379 (5 L. Ed. 257); and again, when
>> "the title or right set up by the party, may be defeated by one construction of
>> the Constitution or law of the United States, and sustained by the opposite
>> construction." *Osborn v. Bank of the United States*, 9 Wheat. 738, 822 (6 L. Ed.
>> 204).
>
> * * *
>
> In the instant case the averments of the bill show that the directors were proceeding
> to make the investments in view of the act authorizing the bonds about to be
> purchased, maintaining that the act authorizing them was constitutional and the
> bonds valid and desirable investments. The objecting shareholder avers in the bill
> that the securities were issued under an unconstitutional law, and hence of no
> validity. It is therefore apparent that the controversy concerns the constitutional
> validity of an act of Congress which is directly drawn in question. The decision
> depends upon the determination of this issue.

*Id*. at 199-201.

By contrast, in *Moore v. Chesapeake & Ohio Ry. Co.*, 291 U.S. 205 (1933), a railroad
worker sued under Kentucky tort law for injuries that he "received while he was engaged as
a switchman in attempting to uncouple certain freight cars and [that] were due to a defective
uncoupling lever." *Id*. at 208. The plaintiff brought two claims, the first under the Federal
Employers' Liability Act ("FELA"), premised on federal question jurisdiction and the

second under Kentucky law, premised on diversity of citizenship jurisdiction. Under
Kentucky law at the time, there existed a provision that an employee could not be found
liable for contributory negligence if the plaintiff's injury was caused, in part, by the railroad's
failure to adhere to any safety law. The plaintiff claimed that the railroad had failed to
follow the Federal Safety Appliance Acts and, therefore, that he could not be found liable for
contributory negligence. The Court of Appeals concluded that the claim stated under
Kentucky law actually arose under the district court's federal question jurisdiction, rather
than its diversity jurisdiction. The Supreme Court reversed, holding that the Kentucky law
claim did not arise under federal law.

> The Federal Safety Appliance Acts prescribed duties, and injured employees
> are entitled to recover for injuries sustained through the breach of these duties.
> *Johnson v. Southern Pacific Co.*, 196 U.S. 1 []; *St. Louis, Iron Mountain & Southern R.
> Co. v. Taylor*, 210 U.S. 281 []; *Texas & Pacific R. Co. v. Rigsby, supra*. Questions
> arising in actions in state courts to recover for injuries sustained by employees in
> intrastate commerce and relating to the scope or construction of the Federal Safety
> Appliance Acts are, of course, federal questions which may appropriately be reviewed
> in this Court. *St. Louis, Iron Mountain & Southern R. Co. v. Taylor, supra; Louisville
> & Nashville R. Co. v. Layton, supra*. But it does not follow that a suit brought under
> the state statute which defines liability to employees who are injured while engaged
> in intrastate commerce, and brings within the purview of the statute a breach of the
> duty imposed by the federal statute, should be regarded as a suit arising under the
> laws of the United States and cognizable in the federal court in the absence of
> diversity of citizenship. The Federal Safety Appliance Acts, while prescribing
> absolute duties, and thus creating correlative rights in favor of injured employees, did
> not attempt to lay down rules governing actions for enforcing these rights. The
> original act of 1893 made no provision for suits, except for penalties. That act did
> impliedly recognize the employee's right of action by providing in section 8 that he
> should not be deemed to have assumed the risk of injury occasioned by the breach of
> duty. But the act made no provision as to the place of suit or the time within which it
> should be brought, or as to the right to recover, or as to those who should be the
> beneficiaries of recovery, in case of the death of the employee. While dealing with
> assumption of risk, the statute did not affect the defense of contributory negligence,
> and hence that defense was still available according to the applicable state law.
> *Schlemmer v. Buffalo, Rochester & Pittsburg R. Co.*, 220 U.S. 590 []; *Minneapolis, St.
> Paul & Sault Ste. Marie R. Co. v. Popplar*, 237 U.S. 369, 371, 372 []. In these respects
> the amended act of 1903 made no change, notwithstanding the enlargement of the
> scope of the statutory requirements. The act of 1910, by a proviso in section 4 relating
> to penalties (36 Stat. 299 (45 USCA § 13)), provided that nothing in that section
> should 'be construed to relieve such carrier from liability in any remedial action for

the death or injury of any railroad employee' caused by the use of the prohibited equipment.

The Safety Appliance Acts having prescribed the duty in this fashion, the right to recover damages sustained by the injured employee through the breach of duty sprang from the principle of the common law (*Texas & Pacific R.R. Co. v. Rigsby, supra,* at pages 39, 40 of 241 U.S., []) and was left to be enforced accordingly, or, in case of the death of the injured employee, according to the applicable statute (*St. Louis, Iron Mountain & Southern R. Co. v. Taylor, supra,* at page 285 of 210 U.S., []; *Minneapolis, St. Paul & Sault Ste. Marie R. Co. v. Popplar, supra*). When the Federal Employers' Liability Act was enacted, it drew to itself the right of action for injuries or death of the employees within its purview who were engaged in interstate commerce, including those cases in which injuries were due to a violation of the Safety Appliance Acts. Such an action must be brought as prescribed in the Federal Employers' Liability Act, and, if brought in the state court, it cannot be removed to the federal court, although violation of the Safety Appliance Acts is involved. *See St. Joseph & G.I.R. Co. v. Moore,* 243 U.S. 311 []. With respect to injuries sustained in intrastate commerce, nothing in the Safety Appliance Acts precluded the state from incorporating in its legislation applicable to local transportation the paramount duty which the Safety Appliance Acts imposed as to the equipment of cars used on interstate railroads. As this Court said in *Minneapolis, St. Paul & Sault Ste. Marie R. Co. v. Popplar, supra,* as to an action for injuries sustained in intrastate commerce: 'The action fell within the familiar category of cases involving the duty of a master to his servant. This duty is defined by the common law, except as it may be modified by legislation. The Federal statute, in the present case, touched the duty of the master at a single point, and, save as provided in the statute, the right of the plaintiff to recover was left to be determined by the law of the state.'

*Id.* at 214-217. *See also Hill v. Marston,* 13 F.3d 1548, 1550 (11th Cir. 1994) ("*Moore* makes clear that violation of a federal standard as an element of a state tort recovery does not fundamentally change the state tort nature of the action."); Patti Alleva, *Prerogative Lost: The Trouble With Statutory Federal Question Doctrine After Merrell Dow,* 52 OHIO ST. L. J. 1477, 1515 (1991) (contending that in *Moore,* "the Court acknowledged the Kentucky legislature's ability to embrace federal standards as its own without simultaneously forfeiting control over hearing the claims that it created.").

The first attempt at reconciliation between the Court's opinions in *Smith* and *Moore* occurred in *Gully v. First Nat. Bank in Meridian,* 299 U.S. 109 (1936). *Gully* involved an attempt by the Mississippi state tax collector to exact debts, including unpaid taxes, allegedly assumed by the defendant bank in the purchase of an insolvent national bank. The case, originally filed in state court, was removed to federal district court on the basis that the case

was one arising under federal law because federal law defined the power of the state to levy

taxes against national banks.  In holding that the case did not arise under federal law by

virtue of the mere fact that the state tax collector relied on the federal statute for permission

to sue the national bank, the Supreme Court first noted that "[t]o bring a case within the

[federal question] statute, a right or immunity created by the Constitution or laws of the

United States must be an element, *and an essential one*, of the plaintiff's cause of action."  *Id.*

at 112 (emphasis added).  After determining that the action arose under state law, the Court

concluded that the federal question arguably raised by the defendant corporation, that a

federal statute had to permit any levy against the purchased national bank, was only

obliquely related to the plaintiff's state law claim:

> We recur to the test announced in *Puerto Rico v. Russell & Co., supra*: 'The federal
> nature of the right to be established is decisive — not the source of the authority to
> establish it.' Here the right to be established is one created by the state. If that is so, it
> is unimportant that federal consent is the source of state authority. To reach the
> underlying law we do not travel back so far. By unimpeachable authority, a suit
> brought upon a state statute does not arise under an act of Congress or the
> Constitution of the United States because prohibited thereby. *Louisville & Nashville
> R. Co. v. Mottley, supra*. With no greater reason can it be said to arise thereunder
> because permitted thereby.
>
> * * *
>
> Petitioner will have to prove that the state law has been obeyed before the question
> will be reached whether anything in its provisions or in administrative conduct under
> it is inconsistent with the federal rule. If what was done by the taxing officers in
> levying the tax in suit did not amount in substance under the law of Mississippi to an
> assessment of the shareholders, but in substance as well as in form was an assessment
> of the bank alone, the conclusion will be inescapable that there was neither tax nor
> debt, apart from any barriers that Congress may have built. On the other hand, a
> finding upon evidence that the Mississippi law has been obeyed may compose the
> controversy altogether, leaving no room for a contention that the federal law has been
> infringed. The most one can say is that a question of federal law is lurking in the
> background, just as farther in the background there lurks a question of constitutional
> law, the question of state power in our federal form of government. A dispute so
> doubtful and conjectural, too far removed from plain necessity, is unavailing to
> extinguish the jurisdiction of the states.
>
>     This Court has had occasion to point out how futile is the attempt to define a
> 'cause of action' without reference to the context. *United States v. Memphis Cotton Oil
> Co.*, 288 U.S. 62, 67, 68 []. To define broadly and in the abstract 'a case arising under
> the Constitution or laws of the United States' has hazards of a kindred order. *What is
> needed is something of that common-sense accommodation of judgment to kaleidoscopic*

*situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end. Bird v. St. Paul, F. & M. Insurance Co.*, 224 N.Y. 47, 51, 120 N.E. 86, 13 A.L.R. 875; *Leyland Shipping Co. v. Norwich Fire Insurance Society*, (1918) A.C. 350, 369; *AEtna Insurance Co. v. Boon*, 95 U.S. 117, 130 []; *Milwaukee & St. Paul R. Co. v. Kellogg*, 94 U.S. 469, 474 []. *Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside. As in problems of causation, so here in the search for the underlying law. If we follow the ascent far enough, countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by.*

*Id.* at 116-18 (emphasis added). *See also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Commission*, 588 F.2d 1216, 1226 (9th Cir. 1978) *as amended on denial of rehearing and rehearing en banc*, (1979) (holding that the Commission Act programs that had been in place under federal law when Hawaii was a territory but made part of state law once Hawaii became a state "are, for all practical purposes, elements of Hawaiian law"); *Bender v. Prudential Ins. Co. of America*, 860 F. Supp. 803, 805-06 (M.D. Ala. 1994) (denying federal question jurisdiction because the plaintiff would "first have to show that the defendants violated Alabama's fraud statutes and that she is entitled to recover punitive damages before the issue will ever arise as to whether the state's restrictions on punitive damages are inconsistent with the United States Constitution").

In *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. at 6, the Supreme Court stated, "Under our interpretations, Congress has given the lower federal courts jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes . . . that the plaintiff's right to relief *necessarily depends on resolution of a substantial question of federal law." Id* (emphasis added). *See also Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 808-09 (1988) (holding the invocation of jurisdiction under § 1338 proper only in "those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims").

The puzzling matter left over from *Franchise Tax Board* involved the issue of what constitutes a "substantial question of federal law."

Three years later, in *Merrell Dow Pharmaceuticals, Inc., v. Thompson*, 478 U.S. 804 (1986), the Supreme Court went some way in explaining the meaning of the phrase "substantial question of federal law." First, the Court held that, usually, no substantial question exists where Congress has not created a federal right of action to remedy the violation of federal law forming the basis of a plaintiff's claim. *Id.* at 814. *See Jairath v. Dyer*, 154 F.3d 1280, 1283 (11th Cir. 1998). *See also City of Huntsville v. City of Madison*, 24 F.3d 169, 173 (11th Cir. 1994) (refusing to read *Merrell Dow* as creating "a bright-line rule" that federal jurisdiction should not exist where no federal remedy had been created, but instead holding that "that it will be only the exceptional federal statute that does not provide for a private remedy but still raises a federal question substantial enough to confer federal question jurisdiction when it is an element of a state cause of action"); *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 54 (2d Cir. 1996) ("subsequent cases in this circuit have not read *Merrell Dow* categorically to preclude federal question jurisdiction in the absence of a private remedy for violation of the relevant federal law"). *But see Smith v. Industrial Valley Title Ins. Co.*, 957 F.2d 90, 93 (3d Cir. 1992) ("Following *Merrell Dow*, we hold that a private federal remedy for violating a federal statute is a prerequisite for finding federal question jurisdiction in this circumstance"). Second, the Court stated that the novelty of the federal law issue was not determinative of its substantial nature. *Merrell Dow Pharmaceuticals, Inc., v. Thompson*, 478 U.S. at 817. Instead, the Court indicated that whether a federal issue is substantial depends on the nature of the federal interest at stake.

> Several commentators have suggested that our § 1331 decisions can best be understood as an evaluation of the nature of the federal interest at stake. *See, e.g.*, Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U.L. REV. 543, 568 (1985); C. WRIGHT, FEDERAL COURTS 96 (4th ed. 1983); Cohen, *The Broken Compass: The Requirement That a Case Arise "Directly" Under Federal Law*, 115 U.PA.L.REV. 890, 916 (1967). *Cf. Kravitz v. Homeowners Warranty Corp.*, 542 F.Supp. 317, 320 (ED Pa. 1982) (Pollak, J.) ("I cannot identify any compelling reasons of federal judicial policy for embracing a case of this kind as a federal question case. The essential Pennsylvania elements of plaintiffs' suit for rescission would be more appropriately dealt with by a Court of

Common Pleas than by this court; and, with respect to the lesser-included issue of federal law, Pennsylvania's courts are fully competent to interpret the Magnuson-Moss Warranty Act and the relevant F.T.C. regulations, subject to review by the United States Supreme Court").

Focusing on the nature of the federal interest, moreover, suggests that the widely perceived "irreconcilable" conflict between the finding of federal jurisdiction in *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 [] (1921), and the finding of no jurisdiction in *Moore v. Chesapeake & Ohio R. Co.*, 291 U.S. 205 [] (1934), *see, e.g.*, M. REDISH, FEDERAL JURISDICTION: TENSIONS IN THE ALLOCATION OF JUDICIAL POWER 67 (1980), is far from clear. For the difference in results can be seen as manifestations of the differences in the nature of the federal issues at stake. In *Smith*, as the Court emphasized, *the issue was the constitutionality of an important federal statute. See* 255 U.S., at 201 [] ("It is . . . apparent that the controversy concerns the constitutional validity of an act of Congress which is directly drawn in question. The decision depends upon the determination of this issue"). In *Moore*, in contrast, the Court emphasized that *the violation of the federal standard as an element of state tort recovery did not fundamentally change the state tort nature of the action. See* 291 U.S., at 216-217 [] ("'The action fell within the familiar category of cases involving the duty of a master to his servant. This duty is defined by the common law, except as it may be modified by legislation. The federal statute, in the present case, touched the duty of the master at a single point and, save as provided in the statute, the right of the plaintiff to recover was left to be determined by the law of the State'") (*quoting Minneapolis, St. P. & S.S.M.R. Co. v. Popplar*, 237 U.S. 369, 372 [] (1915)).

The importance of the nature of the federal issue in federal-question jurisdiction is highlighted by the fact that, despite the usual reliability of the Holmes test as an inclusionary principle, this Court has sometimes found that formally federal causes of action were not properly brought under federal-question jurisdiction because of the overwhelming predominance of state-law issues. *See Shulthis v. McDougal*, 225 U.S. 561, 569-570 [] (1912) ("A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction or effect of such a law, upon the determination of which the result depends. This is especially so of a suit involving rights to land acquired under a law of the United States. If it were not, every suit to establish title to land in the central and western States would so arise, as all titles in those States are traceable back to those laws"); *Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 507 [] (1900) ("We pointed out in the former opinion that it was well settled that a suit to enforce a right which takes its origin in the laws of the United States is not necessarily one arising under the Constitution or laws of the United States, within the meaning of the jurisdiction clauses, for if it did every action to establish title to real estate (at least in the newer States) would be such a one, as all titles in those States come from the United States or by virtue of its laws").

*Id*. at 814 n.12 (emphasis added). *See Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997) (noting the key issue in resolving whether federal question

jurisdiction exists over a state claim with an apparent federal law aspect to be the importance of the federal interest).

The defendants claim that this matter involves a substantial question of federal law, as the court, in ascertaining the propriety of *quo warranto* relief, will need to consider whether the defendants violated certain provisions of RICO and, likely, engaged in Sherman Act-type and Robinson-Patman Act-type anti-competitive practices. Because there exist such substantial questions of federal law, the defendants claim, this court has federal question jurisdiction over the instant action. The defendants are likely correct in their conviction that the instant case involves substantial questions of federal law. First, it can be inferred from Congress's having created statutory civil rights of action to remedy the alleged antitrust and RICO violations claimed that such claims have some federal import. *Merrell Dow Pharmaceuticals, Inc., v. Thompson*, 478 U.S. at 814; *Jairath v. Dyer*, 154 F.3d at 1283. There is likely also an important federal interest at stake, i.e., a determination of the extent and power of the federal antitrust laws and anti-racketeering laws to disenfranchise defendants of their ability to sell ostensibly legal products which have, arguably, deleterious health consequences.[13] Finally, as the defendant has noted, this court has *exclusive jurisdiction* over any civil *federal* antitrust action; as such, there is at least some expressed interest in having such claims litigated in a federal forum. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1329-30 (Fed. Cir. 1998) (concluding that federal question jurisdiction existed over state law injurious falsehood claim where such claim necessitated the determination of whether certain patents were valid, as the federal court has exclusive jurisdiction over patent claims and as the matter at issue involved a federally created property right).[14]

---

[13] For example, as a competitive injury, the plaintiff seems to assert something novel: that because of anti-competitive practices, a healthy alternative to the tobacco products sold by the defendants has not emerged.

[14] However, as has been noted by the Eleventh Circuit Court of Appeals in *Jairath v. Dyer*, 154 F.3d at 1283, the question of whether there exists a substantial issue of federal law somewhat evaporates when it is the case that under the substantive provisions of the law itself, the plaintiff would lack standing to pursue the

Nonetheless, the federal rights involved in the instant case, while perhaps substantial, are not necessary components of the plaintiff's *quo warranto* claim, and, arguably, the plaintiff can adequately make out his claim without demonstrating violations of any federal statute. Indeed, state *quo warranto* actions are generally meant to stop a person or corporation from exercising authority that the person or corporation was not permitted to exercise under *state*, not federal, law. *See Wynn v. Philip Morris, Inc.*, CV 98-BU-1597-S, Memorandum Opinion entered on November 23, 1998, at 3. It is not the case that merely because federal antitrust law and RICO present alternative bases of granting the *quo warranto* relief requested in this action, the plaintiff's right to relief will "necessarily depend on a resolution of a substantial question of federal law." *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. at 6. Far from being an intricate part of the web of connections that hold the plaintiff's claim together, the federal statutory grounds for *quo warranto* relief are isolated threads, the presence or absence of which makes no integral difference to the plaintiff's claim as a whole. *See Gully v. First Nat. Bank in Meridian*, 299 U.S. at 118.

Attempting to avoid the problems ensuing from their argument that federal question jurisdiction exists due to the presence of a necessary and substantial federal element to the state law *quo warranto* action, the defendants assert that the plaintiff's recitation of jurisdiction under the substantive remedial statutes governing antitrust and RICO civil claims is sufficient to create federal question jurisdiction. This mere recitation does not form the grounds for federal question jurisdiction, however. This is so, first, because the plaintiff's *only* substantive claim is that brought under state law for *quo warranto* relief; the plaintiff brings no freestanding federal claims. Second, it is the case that, even if Wynn sought to bring an action pursuant to either of these statutes, without regard to the State's

---

action. *See infra.*

*quo warranto* provisions, but solely as a plaintiff bringing suit on his own behalf to recover under the enforcement provisions, the plaintiff would lack standing to proceed.[15]

Both the federal antitrust statutes and RICO have civil remedy provisions. Section 15 of Title 15 of the United States Code states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent. . . ." Similarly, 18 U.S.C. § 1964, the civil remedies provision of RICO, provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court. . . ."

Suits brought pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, must satisfy, in addition to constitutional standing requirements, the statutory standing prerequisites of an antitrust action. *Municipal Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1498 (11th Cir. 1991). Demonstration of antitrust standing involves a two-pronged analysis. *Id.*

> First, the plaintiff must establish that it has suffered "antitrust injury." [*Municipal Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d at 1499.] As the Supreme Court has made clear, to have standing antitrust plaintiffs "must prove more than injury casually linked to an illegal presence in the market [i.e., but for causation]. Plaintiffs must prove antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 [](1977).

*Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 296. "What constitutes an antitrust injury is of course determined by the intent of the antitrust laws. . . ." *Johnson v. University Health Services, Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998).

---

[15] The *quo warranto* statute gives Wynn the authority to bring his suit as a relator for the State for purposes of the *quo warranto* action only. It does not give him the ability to prosecute, on behalf of the state, any other substantive claim either under state or federal law. Therefore, Wynn, insofar as it is argued that he seeks to do so, can only bring his federal claim or claims on his own behalf, and not as a relator of the State of Alabama.

> Second, the plaintiff must establish that it is an efficient enforcer of the antitrust laws. *Municipal Utils. Bd. of Albertville*, 934 F.2d at 1499. This determination is predicated on the "target area test." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir. 1990). The target area test requires that an antitrust plaintiff both "prove that he is within that sector of the economy endangered by a breakdown of competitive conditions in a particular industry" and that he is "the target against which anticompetitive activity is directed." *National Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir. 1984), *cert. denied sub nom., Patterson v. Buena Vista Distribution Co.*, 474 U.S. 1013 [] (1985). Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market. *Associated General Contractors*, 459 U.S. at 539 [].

*Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d at 1374.

Any purported claim against the defendants would seemingly be based upon oligopolistic anti-competitive practices, such as price fixing, prohibited under the Sherman Act, 15 U.S.C. § 1, and based upon oligopolistic, anti-competitive price discrimination under the Robinson-Patman Act. 15 U.S.C. § 13.[16] Regardless of the specific provisions under which Wynn's claim or claims are brought, the antitrust injuries which must have occurred to create antitrust standing are impediments to the plaintiff's ability to compete. *Id.*[17]

---

[16] In actuality, the plaintiff's complaint seems to focus on a conspiracy to control the cigarette market and "suppress competition" in that market. As recited, the alleged violations in question are of the Sherman Antitrust Act and the Robinson-Patman Act, rather than arguable attempts to enter into tying arrangements with purchasers of cigarettes under § 14 of Title 15, although this too may be an aspect of the plaintiff's action.

[17] In *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1418 n.6 (11th Cir. 1990), the Eleventh Circuit Court of Appeals discussed the wide variety of meanings "competitive injury" has taken:
> A controversy has raged (and continues to rage) over the meaning of the word "competition" as used in the so-called "competitive injury" phrase of section 2(a) [of the Clayton Act]. *See, e.g., Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1143 (Starr, J.); *id.*, at 1148-52 (Williams, J., concurring); *id.*, at 1152-63 (Mikva, J., dissenting). The word "competition" as generally used in the antitrust laws seems capable of meaning different things to different people and, according to one commentator, can be interpreted in at least five ways. *See* R. BORK, THE ANTITRUST PARADOX 58- 61 (1978). To some, "competition" can only mean "any state of affairs in which consumer welfare cannot be increased by moving to an alternative state of affairs through judicial decree," *id.*, at 61, and competitive injury under the antitrust laws cannot occur unless an action taken has the net effect of restricting output and raising prices, i.e., lowering consumer welfare. *Id.*, at 122. *See also Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). Under this interpretation a proven injury to competitors is irrelevant under the antitrust laws (including the [Robinson-Patman

Act]); the focus of inquiry is on the detrimental effects of prices on consumers, not the detrimental effect of prices on competitors, for rarely the twain shall meet.

    Judicial precedent, however, suggests that in the [Robinson-Patman Act] the meaning of competition is not so narrow, nor the gap between an injury to competition and an injury to competitors so wide. Indeed, many cases dealing with secondary-line price discrimination (as does this one) hold or suggest that an injury to competition is proved by showing an injury to competitors. *See, e.g., Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434-38 [] (1983) (section 2(a) competitive injury shown where price charged to "competing purchasers" was different; effect on consumers not considered); *Morton Salt,* 334 U.S. 37, 45-47, 49-50 [] (section 2(a) "was intended to justify a finding of injury to competition by a showing of 'injury to the competitor victimized by the discrimination'"; proof that "the competitive opportunity of . . . merchants [was] injured" shown by fact that disfavored purchasers "had to pay [the seller] substantially more for their goods than their competitors had to pay"); *Corn Prod. Ref. Co.,* 324 U.S. 726, 738-39 [] (price differentials that divert business from one competitor to another create an effect that "may be to substantially lessen competition."); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1040 (9th Cir. 1988), *cert. granted,* 490 U.S. 1105 [] (1989) (injury of harm to competitors probative of injury to competition); *Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 385 (8th Cir. 1987) (harm to competition established by showing harm to competitors); *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 580 (5th Cir.), *cert. denied,* 459 U.S. 908 [] (1982) (to establish competitive injury under section 2(a) a plaintiff "must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor"); *Foremost Dairies, Inc. v. FTC,* 348 F.2d 674, 678 (5th Cir.), *cert. denied,* 382 U.S. 959 [] (1965) (recognizing that section 2(a) protects injury to competition as well as injury to competitors). *But see Boise Cascade, supra,* at 1143 (harm to competition all that matters); *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 420 (8th Cir. 1986) (RPA refers to competition in general, not competitors). This interpretation has carried over to primary-line price discrimination as well. *See Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685 [] (1967) (local market price war driving down prices injured competitor, thus it injured competition); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396 (7th Cir. 1989) (recognizing difference between law and economics); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487 (11th Cir. 1988), *cert. denied,* 490 U.S. 1084 [] (1989) (predatory intent to destroy competitor). *But cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 [] (1986) (allegations conflicting with economic theory are to be viewed skeptically). The gist of these cases, representing about a half- century of [Robinson-Patman Act] interpretation, is that the legal focus of the competitive injury inquiry is on the competitor, not the consumer. For section 2(a) purposes, whether or not output is restricted or prices are raised simply is not dispositive.

    We need not address this issue in any greater detail at this time. We address it at all only because the controversy over competitive injury may have implications for our later analysis of "antitrust injury" under Clayton Act section 4, 15 U.S.C. § 16. For the time being we are satisfied merely to make it clear that when confronted with contemporary economic argument on the one hand and judicial precedent on the other, we feel, unlike those of a more activist bent, *see, e.g.,* R. BORK, *supra,* at 36, that economic argument is not ultimately controlling; judicial precedent is.

Subsequent to the Eleventh Circuit Court of Appeals decision in *Alan's of Atlanta,* the Supreme

The court concludes that Wynn has suffered no antitrust injury in this case because he is not a target against whom anti-competitive activity was, or is, directed. There is no allegation by the plaintiff that he attempted in any way to introduce products into the market in competition with the defendants and that the defendants, through the use of market power, deprived the plaintiff of the ability to compete, or that, because of price discrimination, cigarettes were more costly to him than would otherwise be the case. As he is neither a seller of products competing with the relevant products of the defendants in same relevant geographic market[18] nor a purchaser of those products who was required to pay more than another, favored competing purchaser, the plaintiff can show no antitrust injury to himself at all.[19] Thus, the plaintiff has demonstrated no personal injury to his ability to compete in the market, because the plaintiff never competed or participated in the market, nor does he plan to do so.

> Congress modeled the civil remedy provision of RICO, §18 U.S.C. 1964(c), after section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1988 & Supp. II 1990), *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, —, 112 S.Ct. 1311, 1317 [] (1992); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489 n. 8 [] (1985), the provision pursuant to which the plaintiffs in [*Keogh v. Cicago & Northwestern Ry.*, 260 U.S. 156 (1922)] and [*Square D v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986)] sought to obtain trebled damages. Indeed, both statutes confer standing to bring a

---

Court decided *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993), in which the Court, swayed by the "preconceived idea of crystalline purity" (WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS at § 108) embodied in prevailing economic *haute couture*, concluded that an injury to competition is ultimately nothing more than an idealized lower cost to consumers, regardless of whether such short-term lower costs result in *actual*, as opposed to theoretical, long-term lower costs or fewer beneficial products. Although stated in the context of a Robinson-Patman Act claim, the concept advanced was apparently made applicable to all antitrust claims. Under such a theory, the use of market power to prevent substitutes for tobacco products from reaching the market cannot be the basis of antitrust injury. However, the court does not rest its conclusion that no antitrust injury exists on this ground. Rather, the court concludes that the absence of an antitrust injury is due to the fact that *Wynn* cannot allege, as an individual, an antitrust injury particular to himself.

[18] I.e., the plaintiff has not alleged that he himself suffered a "primary-line" injury. Under Wynn's theory, an individual, to be a target of anti-competitive practices would have to be attempting to compete or competing in the market by selling healthy cigarettes.

[19] I.e., the plaintiff has not alleged that he suffered a "secondary-line" injury.

> private civil action in the exact same language: only upon a person "injured in his business or property. . . .'

*Taffet v. Southern Co.*, 967 F.2d 1483, 1494 n. 12(11ᵗʰ Cir. 1992), *cert. denied*, 506 U.S. 1012. Thus, as with cases brought by private citizens under 15 U.S.C. § 15 for violations of the antitrust laws, suits brought pursuant to 18 U.S.C. § 1964 must satisfy special standing requirements.   One prerequisite of such standing is that "the party's injuries be the *direct result* of the alleged racketeering activity." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, (11ᵗʰ Cir. 1998)(emphasis added).  Any injury must be proximately caused by the illegal activity.  *Id.*  In his amended complaint, the plaintiff posits the specific category of individuals injured by the defendants' alleged RICO violations: "the industry's own customers, prospective customers and the children of Alabama."  Plaintiff's Second Amended Complaint at 4.  It is unclear how the plaintiff has plead *any* injury to himself, much less a direct injury as required under § 1964 for RICO standing.[20]  The defendants' arguments that federal question jurisdiction exists in the instant suit therefore fail.[21]

DIVERSITY JURISDICTION.

There are two prerequisites for  diversity jurisdiction under 28 U.S.C. § 1332(a)(1): First, there must exist complete diversity of state or foreign citizenship between each plaintiff and all defendants.  *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806) and *Owen*

---

[20]  The defendants seem to suggest that the plaintiff also asserts independent mail fraud claims under 18 U.S.C. § 1341 and wire fraud claims under 18 U.S.C. § 1343.  However, the plaintiff's amended complaint fails to bear out this assertion.  Rather than assert independent mail or wire fraud claims, the plaintiff incorporates these violations into his broad assertion of RICO violations which help make up his *quo warranto* claim.

[21]  The defendants contend that because there exists federal question jurisdiction over plaintiff's antitrust and RICO claims, the court has supplemental jurisdiction over the remaining state law claims of the plaintiff.  Section 1367 of Title 28 states that a federal district court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  However, as this court lacks original jurisdiction over the instant suit based upon federal question jurisdiction, it has no authority to assert jurisdiction over any related state law claims, to the extent that such exist at all.

*Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978). Second, the value of the matter in controversy must exceed the present statutory amount of "$75,000.00, exclusive of interest and costs." 28 U.S.C. § 1332(a). On March 16, 1999, the court requested briefing on the issue of whether, as the State is required to be made the named party to a *quo warranto* proceeding under § 6-6-591 of the Alabama Code of 1975, diversity of citizenship is lacking in the instant action.

Jurisdiction under 28 U.S.C. § 1332 requires that all parties to an action be "citizens" of a state or a foreign state. *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 189-90 (1924). "[I]t is well established that a state is not a citizen of a state for the purpose of diversity jurisdiction under §28 U.S.C. 1332." *University of South Alabama v. American Tobacco Co.*, 168 F.3d at 411. *See Postal Telegraph Cable Co. v. State of Alabama*, 155 U.S. 482, 487 (1894) ("A state is not a citizen. And under the judiciary acts of the United States it is well settled that a suit between a state and a citizen or a corporation of another state is not between citizens of different states, and that the circuit court of the United States has no jurisdiction of it, unless it arises under the constitution, laws, or treaties of the United States.") (*citing Ames v. Kansas*, 111 U. S. 449 (1884); *Stone v. South Carolina*, 117 U. S. 430 (1886); *Germania Ins. Co. v. Wisconsin*, 119 U. S. 473(1886)). The State of Alabma is listed on the face of the complaint as the beneficiary of the action brought by the relator Wynn. From the face of the pleadings, therefore, the court would appear to lack diversity jurisdiction over the instant action.

The mere presence of the State of Alabama on the pleadings as a plaintiff, however, is alone not sufficient to divest this court of diversity of jurisdiction, if the State is listed merely as a nominal plaintiff. *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980)(stating that "a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy"). *See Bacon v. Rives*, 106 U.S. 99, 104 (1882) (holding that defendants in role of mere garnishees were immaterial parties for purposes of determining diversity of citizenship). For example, in *Wormley v. Wormley*, 21 U.S. 421 (1823), the plaintiffs, all apparently residents of Kentucky, sued the defendants, who were all

residents of other states, except for a husband of one of the plaintiffs who was also a resident of Kentucky, but who was joined simply as "a nominal defendant, joined for the sake of conformity in the bill, against whom no decree is sought." *Id.* at 451. The Supreme Court determined that it was not divested of diversity jurisdiction, stating, "This Court will not suffer its jurisdiction to be ousted by the mere joinder or non-joinder of formal parties; but will rather proceed without them, and decide upon the merits of the case between the parties, who have the real interests before it, whenever it can be done without prejudice to the rights of others." *Id.* If, then, the State of Alabama is a nominal party to this action, there exists diversity of citizenship; if, however, the State is a real party in interest, the *quo warranto* action clearly falls outside of this court's purview. *See* WRIGHT, MILLER & COOPER, FED. PRAC. & PROC. 2D, § 3606, at 409 ("In determining whether complete diversity exists, nominal or formal parties who have no interest in the action *will be ignored*.").

In *Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989), the Eleventh Circuit Court of Appeals elaborated on whether federal or state law governs the resolution of who is a real party in interest and who is merely a nominal, or formal, party to a suit:

> Federal courts look to the substantive law of the state, however, to determine whether an individual, although a party to the lawsuit, is a real and substantial party to the litigation. *Jones v. Griffith*, 688 F.Supp. 446, 450 (N.D.Ind. 1988), *vacated on other grounds*, 870 F.2d 1363 (7th Cir. 1989). This hurdle prevents a party with an insufficient interest in the litigation from using his or her citizenship to transfer a local controversy into one within federal diversity jurisdiction and vice- versa. *See Wilsey v. Eddingfield*, 780 F.2d 614 (7th Cir. 1985), *cert. denied*, 475 U.S. 1130 [] (1986). Thus, *Federal courts do not consider the controlling state's procedural law as to who must be a party to any given action, but rather look to determine upon whom the state confers substantive rights.* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, CIVIL § 1544 (1971). *Cf. Lumbermen's Mutual Casualty Company v. Elbert*, 348 U.S. 48, 51 [] (1954) (insurance company real party in interest where state law gave plaintiff direct cause of action against the company).

(Emphasis added.) *See also* WRIGHT & MILLER, FED. PRAC. & PROC. 2D, § 1544, at 340-42 (stating that "the court must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief. In light of the Supreme Court's decision in Erie Railroad Company v. Tompkins, [304 U.S.

64 (1938)], state law will control in an action based on diversity of citizenship for purposes of ascertaining who possesses the original cause of action. . . . The forum state's procedural statute or rule defining the real party in interest concept is not applicable, however, because it only governs who may sue in the state courts." (footnotes omitted)). *But see,* FED. PROC., *Access to District Courts,* § 1.60, at 99 (asserting that the determination of whether a party is a real party in interest for purposes of diversity of citizenship is made with reference to federal law, but noting disagreement).[22]

The reason generally given for dispensing with state procedural law in determining the real party in interest  is that the doctrine pronounced in *Erie Railroad Company v. Tompkins,* 304 U.S. 64 (1938), that the appropriate substantive law to be applied in a diversity actions is that determined by the choice of law provisions of the state in which the

---

[22] In *Lumbermen's Mutual Casualty Company v. Elbert*, 348 U.S. 48, 50-51 (1954) (cited by the Eleventh Circuit Court of Appeals in *Broyles v. Bayless*, 878 F.2d at 1402), the Supreme Court stated:
> Section 1332(a) of the Judicial Code, 28 U.S.C. s 1332(a), 28 U.S.C.A. s 1332(a), reads as follows:
>> "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $3,000 exclusive of interest and costs, and is between:
>>> "(1) Citizens of different States * * *."
> It is petitioner's contention that the 'matter in controversy' here is the underlying tort liability of the alleged wrongdoer. If this were true, of course, no diversity of citizenship would exist between respondent and Mrs. Bowen, as the real party-defendant in interest. But the Louisiana courts have differentiated between actions brought by an injured party against the insurer alone and those brought against either the tortfeasor alone or together with the insurer.  In the former action, the insurer is foreclosed from asserting defenses such as coverture, normally available to the tortfeasor. *Edwards v. Royalty Indemnity Co.,* 182 La. 171, 161 So. 191. Similarly, the insurer is severely restricted in advancing technical defenses based upon the terms of the policy, such as a failure of notice, when the injured party brings a direct action. *Jackson v. State Farm Mutual Automobile Ins. Co.*, 211 La. 19, 29 So.2d 177. While either type of action  encompasses proof of the tortfeasor's negligence, in the separate suit against the insurer a plaintiff must also establish liability under the policy. The Louisiana courts have characterized the statute as creating a separate and distinct cause of action against the insurer which an injured party may elect in lieu of his action against the tortfeasor. *West v. Monroe Bakery,* 217 La. 189, 46 So.2d 122; *Jackson v. State Farm Mutual Automobile Ins. Co., supra.*

> \* \* \*

> There is even greater justification for disregarding the tortfeasor's citizenship here than for disregarding the citizenship of a beneficiary since the insurer — unlike a fiduciary — has a direct financial interest in the outcome of this litigation.

district court sits — i.e., some state's substantive law applies in all diversity actions, is also straightforwardly applicable to the determination of who under state law is a real party in interest. As presented though, that rationale is not all that it is cracked up to be, as it bootstraps the substantive law of the state onto the jurisdictional issue.[23] The presence or

---

[23] If a state could, through mere procedural decisions restrict the rights of access of parties to federal court, that state could, through its own action constrict the diversity jurisdiction of the federal court, which it is not permitted to do. A good example of this in a different context is *Begay v. Kerr-McGee Corporation*, 682 F.2d 1311 (9th Cir. 1982). In that case, the plaintiff Navajo miners working on uranium mines on a Navajo reservation brought an action against the defendant claiming that they were exposed to radiation in the course of their employment and as a consequence of the exposure suffered severe injuries. The district court dismissed the action on the grounds that because the state vested exclusive jurisdiction in the state workers' compensation commission, no subject matter jurisdiction remained with the court. The Ninth Circuit Court of Appeals disagreed with the district court on this issue, stating that while the requirement that the plaintiffs proceed under the state workers compensation laws may have deprived the plaintiffs of a substantive claim, it did not deprive the district court of subject matter jurisdiction. *Id.* at 1317.

The district judge apparently concluded that because Arizona law would deprive an Arizona court of jurisdiction in a like case filed in state court, the federal court lacked diversity jurisdiction. Here, he erred. The question is whether the Indian" complaint stated a claim for relief under Arizona law pursuant to Erie, rather than whether the district court lacked subject matter jurisdiction. *See Black v. Payne*, 591 F.2d 83, 86 n.1 (9th Cir. 1979) (federal question). Although the states have the power to prevent the federal court from granting relief in a diversity case by denying the substantive right of action asserted, they "have no power to enlarge or contract the federal jurisdiction." *Markham v. City of Newport News*, 292 F.2d 711, 713 (4th Cir. 1961). *See Railway Co. v. Whitton's Adm'r*, 80 U.S. (13 Wall.) 270, 286 [] (1871); *Greyhound Lines, Inc. v. Lexington State Bank & Trust Co.*, 604 F.2d 1151, 1154-55 (8th Cir. 1979); *Poitra v. DeMarrias*, 502 F.2d 23, 25-27 (8th Cir. 1974), *cert. denied*, 421 U.S. 934 [] (1975). "State rules will not be applied 'to thwart the purposes of statutes of the United States.'" *Pankow Constr. Co. v. Advance Mortgage Corp.*, 618 F.2d 611, 613 (9th Cir. 1980), *quoting Sola Elec. Co. v. Jefferson Co.*, 317 U.S. 173, 176 [] (1942). Thus, state law may not control or limit the diversity jurisdiction of the federal courts. The district court's diversity jurisdiction is a creature of federal law under Article III and 28 U.S.C. § 1332(a). Pursuant to the supremacy clause, section 1332(a) preempts any contrary state law. Nothing in Erie compels a different conclusion. "The *Erie* doctrine does not extend to matters of jurisdiction or, generally, to matters of procedure. . . . *Erie* requires that the federal court grant or withhold relief as the state courts would. It does not require relegation of the diversity jurisdiction to the mercies of the legislatures of fifty separate states." *Markham v. City of Newport News, supra*, 292 F.2d at 718.

Indeed, the *Erie* doctrine rests upon the premise that the jurisdiction of the federal diversity court is satisfied, and addresses only the question whether federal or state law provides the substantive rules of decision in the case. *See Erie, supra*, 304 U.S. at 74-77 []. Regardless of whether *Erie* primarily involves interpretation of the Constitution or the Rules of Decision Act, 28 U.S.C. § 1652, *see* P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 706-08 (2d ed. 1973), it does not purport to permit state control of areas in which Congress has acted pursuant to its constitutional authority. *See Erie, supra*, 304 U.S. at 78 [] ("Except in matters

absence of subject-matter jurisdiction is a federal issue, to be resolved prior to the assessment of the substantive rule of decision to be applied to a case. Nonetheless, *Erie* doctrine does have an impact on the issue of how and why state substantive law is to be applied in determining who is a real party in interest in an action. Who constitutes a real party in interest in an action for purposes of diversity of citizenship must be determined with reference as to what the matter in controversy is. If a party has no real interest in the matter in controversy, then the legally cognizable value or sum of that matter is nothing to that party, and he or she can have no real stake in the outcome of the action. Where jurisdiction over an action is founded upon diversity, whether a cognizable interest in the matter in controversy exists, and hence, whether a named party is a real party in interest, will be a matter of state substantive, rather than procedural law.

The court must therefore determine whether the State of Alabama has a legally cognizable interest in the present action. The defendants, pointing to *State Board of Optometry v. Lee Optical Co.*, 287 So.2d 35, 36-37 (1971), an Alabama Supreme Court decision, contend that Alabama is merely a nominal party to the action, with no cognizable interest in the matter in controversy in the instant suit. In *Lee Optical*, the plaintiff State Board of Optometry brought a *quo warranto* action against the defendant, Lee Optical, to prevent it from engaging in the "unlawful practice of optometry." *Id*. at 36. The defendant demurred to the petition on the grounds that the State Board of Optometry was incapable of bringing the action; the state trial court sustained the demurrer. An amended petition was then filed in the name of the State of Alabama on relation of the State Board of Optometry. A demurrer was again filed, this time on the grounds that a new party had been added to the

---

governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."). Nothing in *Erie*, its progeny, or the principles of federalism supporting the doctrine suggests that a state statute may operate to divest a federal court of the jurisdiction conferred by 28 U.S.C. § 1332(a). Only Congress, by repealing section 1332, has the constitutional authority to abolish or limit the district court's jurisdiction to hear all cases and controversies between citizens of different states which involve the requisite amount in controversy.

*Id*. at 1315-16.

suit; again, the demurrer was sustained by the trial court. The State Board of Optometry
then filed another amended petition, removing the State as a party and proceeding in its
own name. Once more, the defendant balked, stating that the State Board of Optometry had
shuffled the parties. The trial court granted the demurrer and dismissed the suit. On appeal
to the Alabama Supreme Court, it was held that the removal of the State of Alabama from
the plaintiff's petition was the removal of a mere nominal party. *Id.* at 36-37. "In *quo
warranto* actions the rule is established that where suit is brought by the State on relation of
another party, it is the relator and not the State who is the real party in interest." *Id.* at 37.

In coming to this conclusion, the Alabama Supreme Court relied upon its earlier
decision in *Baxter v. State ex rel. Metcalf*, 243 Ala. 120, 9 So.2d 119 (Ala. 1942). In *Baxter*,
Metcalf brought an action as relator for the State of Alabama, requesting the ouster of
Baxter, an assistant superintendent for the Etowah County Board of Education who was to
fill in for the elected superintendent, a member of the State National Guard called away into
the United States Army. The trial court granted the writ of *quo warranto* and ousted Baxter.
An appeal to the Alabama Supreme Court followed. *Id.* On appeal, the Alabama Supreme
Court was first confronted by an argument propounded by the State's Attorney General that
his officer had a "right of control" over the action and that, as the action was not in the
public welfare, the writ of *quo warranto* could not issue. The court disagreed, stating that an
individual could bring a *quo warranto* action without the approval of the Attorney General.
In arriving at this conclusion and using it as a springboard for reversing the trial court's
order, the Alabama Supreme Court further stated:

> It is only by virtue of our statutory system that an individual, in a case of this
> character, has any standing in court. The use of the name of the State is more or less
> a formality. The State is without interest and only a formal party to the cause (*State v.
> Butler*, supra; 51 C.J. 334), though we have sanctioned the view a proceeding
> instituted in the name of the State on relation of an individual suffices for the
> purpose of an amendment making the relator as an individual party thereto. *West
> End v. State*, 138 Ala. 295, 36 So. 423.
>
> But proceeding to a final judgment of ouster upon the petition in the name of
> the State alone is tantamount to granting relief to a mere nominal party and one who
> in fact seeks no redress and is without interest in the result. Indeed, as above
> indicated, the State through the Attorney General has demonstrated any such relief is

not desired. Originally the writ of quo warranto issued out of chancery (22 R.C.L. 683) and we have often entered reversals on appeal in equity cases for a want of a necessary party to the suit though the question was not raised in the court below.

As said in *Pate v. Hall*, 220 Ala. 411, 125 So. 650, 652, "in many cases a reversal will be had out of regard for the orderly administration of justice."

Under the provisions of Section 1142, Code, *supra*, when the action is brought on the information of any person "his name must be joined as plaintiff with the state." Our statutory system has supplemented the common-law remedy and is now the only system of laws touching quo warranto proceedings obtaining in this State and we have held that such a proceeding that fails to meet the statutory requirements as to parties and procedure cannot be maintained. *Louisville & N. R. R. Co. v. State ex rel. Gray*, 154 Ala. 156, 45 So. 296.

Though the question was not presented in the court below, yet to proceed to final judgment without such joinder is to grant relief not only in the absence of necessary party, but in favor of a mere nominal party and in utter disregard of the statute. It bears some analogy to those cases where judgment is entered upon a complaint stating no cause of action, as discussed in *Kirkland v. Pilcher*, 174 Ala. 170, 57 So. 46. We, therefore, conclude the judgment is due to be reversed for the reason stated.

*Id.* at 120-21. To some degree the decision of the Alabama Supreme Court is incomprehensible. As an apparent consequence of its holding in *Baxter*,[24] a relator in a *quo warranto* action was obligated not merely to bring his action as a relator for the State, but was required to join himself as a party to the action.[25] More significant, though, is the conclusion of the Court that the State is a mere nominal party that cannot proceed alone in a *quo warranto* action and that failure of a plaintiff to join himself or herself to a *quo warranto* action will bar a judgment against the defendant due to the absence of a plaintiff who is a real party in interest. It would appear, then, that for purposes of proceeding under the *quo warranto* provisions of the Alabama Code, the inclusion of the State as a party to the action is a mere formalism.

---

[24] And Alabama statutory law, as evidenced by Alabama Code § 6-6-595, which states, "Whenever an action is commenced under the provisions of this article on the information of any person, his name must be joined as a plaintiff with the state."

[25] The plaintiff has apparently made himself individually a party to the action, although, again, clarification of the style of this case by the plaintiff *might* clear up this little confusion. (This court, were it to retain jurisdiction over the instant action, would have crafted the prior statement in more imperative terms.)

This would tend to indicate that, under the state law, the State of Alabama is not the real party in interest in the present action. However, without more, the language of these two cases merely indicates that the State is a real party in interest for purposes of state procedural law. Whether the State of Alabama would constitute, as a matter of state substantive law, a real party in interest in a given action is not at issue in those cases. Rather, the conclusions of *Lee Optical* and *Metcalf* are that, for the purposes of who is required to be joined to a *quo warranto* action in state court, the State is a nominal party and that the relator the real party in interest. However, this statement of state law does not resolve the genuine issue with respect to whether or not the State in the instant action is a real party in interest, i.e., "[t]hat person who can discharge the claim upon which suit is brought and control the action brought to enforce it, and not necessarily the person ultimately entitled to the benefit of the recovery or the person beneficially interested therein." 59 AM. JUR. 2D § 36 (1987).

The issue is a complicated one. As a matter of Alabama substantive law, the grant of a *quo warranto* writ is proper only when a public, rather than private, interest is to be served. Further, any benefit accruing from successful prosecution of the *quo warranto* action will accrue principally to the State. There will, of course, be the obvious benefits and detriments to particular individuals who do seek or would seek tobacco products which need not be gone into here. Wynn obtains nothing personal gratification from this action. At the same time, the State has no authority to intervene or control Wynn's action against the defendants. In an abundance of caution the court concludes that the State is merely a formal party to the suit, having no interest in the matter in controversy, the right of the defendants to act under a certificate of authority in the State.

Nonetheless, even if, or, more properly, *because* the State is not a real party in interest in the instant action, the court lacks jurisdiction over the matter, because the value of the matter in controversy to the real party in interest, Wynn, does not exceed $75,000.00. This court earlier concluded that the benefit to the State arising from this suit if the plaintiff prevailed was more likely than not a sum exceeding $75,000.00, as a consequence of lessened costs for the treatment of illness, improvements in the quality of life, and similar

consequences. The court further found that this relief was aggregate relief on behalf of the citizens of Alabama, in which Wynn partook.

Upon reconsideration, and in light of this court's conclusion that the State of Alabama is not a real party in interest in the present action, the court concludes that any aggregate right of relief that the State enjoys is not one in which Wynn partakes. As the State is not a real party in interest, any benefit accruing to it in the present action is not to be calculated as part of the amount in controversy for Wynn. In *Glover v. Midland Mortgage Co. of Oklahoma, Inc.*, 228 B.R. 293, 296 (N.D. Ala. 1998), this court stated that "where the matter in controversy involves a collective right, not particular to each individual plaintiff, the Court has held that aggregation is permissible." However, there is no indication in this case that there is any common and undivided right between the State of Alabama and Wynn. In fact, that the State exists as merely a nominal party to this action indicates that any right belongs solely to Wynn. That Wynn is the real party in interest in the present action while the State is not demonstrates the existence of an interest of Wynn that is not a common and undivided right of relief between the two parties. The separate right of relief on which Wynn pursues his action, exclusive of the State of Alabama, cannot be the basis of any interest in an aggregate right on which the State of Alabama might recover.[26] The value of the matter in controversy in this *quo warranto* action is, therefore, calculated from the perspective of Wynn and Wynn alone. Any benefit accruing to Wynn alone is certainly less than $75,000.00, as it is comprised of little more than good feeling resulting from revocation of the defendants' certificates of authority. Therefore, there is no diversity of citizenship jurisdiction over the instant action.[27]

---

[26] In the same way in which later plaintiffs seeking punitive damages under Alabama law cannot be said to have an aggregate matter in controversy permitting removal to federal court on the basis of an earlier punitive damages award for the same or similar actions, even though if those later plaintiffs had been parties to the original action their claims could have been removed to federal court because the punitive relief was aggregable, because the State is not a party here, any aggregate award it might receive in a future action cannot be attributed back to Wynn's *quo warranto* suit.

[27] Arguably, the case is like one in which a plaintiff seeks prospective injunctive relief that would prevent a defendant in engaging in future conduct similar to that suffered by the plaintiff. However, Wynn

In sum, there can be no diversity jurisdiction in the instant action.  If the State of Alabama *is* a real party in interest, there can be no diversity of citizenship, as Alabama is not a citizen of a state, but a State itself.  If, however, as the court has determined, the State *is not* a real party in interest, then any benefit it might receive from this action is not attributable to Wynn for purposes of determining the value of the matter in controversy.  Consequently, the value of the matter in controversy in the action is manifestly and substantially less than $75,000, as Wynn gets nothing from bringing this action except the rich, full pleasure of smoking a cigarette company.

Conclusion

For the foregoing reasons, this case will be REMANDED to the Circuit Court of Jefferson County, Alabama.  Costs will be taxed against the defendants.

DONE and ORDERED this 28th day of April 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

---

can only pursue this action in his own name; the State is not a potential party to this action. At best, the State could only sue to prevent a defendant from selling products in the state without a certificate of authority subsequent to the revocation of that certificate. *See Glover v. Midland Mortgage Co. of Oklahoma, Inc.*, 228 B.R. at 312 (stating that "if an injunction was issued, future suits arising under the injunction would provide a common and undivided right of relief, but at present, each prospective plaintiff's right for relief is his or her own").